RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0311P (6th Cir.)
File Name: 02a0311p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          *v.*

DARWIN JAY COPELAND
(01-1005); ANTHONY
ANTOINE HARTWELL
(01-1016),
          *Defendants-Appellants.*

Nos. 01-1005/1016

> Appeal from the United States District Court
> for the Eastern District of Michigan at Flint.
> No. 99-50057—Paul V. Gadola, District Judge.
>
> Argued: June 18, 2002
>
> Decided and Filed: September 10, 2002
>
> Before: COLE and GILMAN, Circuit Judges; MILLS,
> District Judge.

_____

[*] The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:** Daniel D. Bremer, Burton, Michigan, Robert A. Ratliff, ROBERTS, SHIELDS & GREEN, Mobile, Alabama, for Appellants.    Mark C. Jones, ASSISTANT UNITED STATES ATTORNEY, Flint, Michigan, for Appellee. **ON BRIEF:** Daniel D. Bremer, Burton, Michigan, Robert A. Ratliff, ROBERTS, SHIELDS & GREEN, Mobile, Alabama, for Appellants.    Mark C. Jones, Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

**OPINION**
_____

R. GUY COLE, JR., Circuit Judge. Defendants-Appellants Darwin Jay Copeland and Anthony Antoine Hartwell appeal their convictions and sentences stemming from charges of conspiracy to distribute a controlled substance under 21 U.S.C. §§ 841(a) and 846 and for possession of a firearm by a felon under 18 U.S.C. § 922(g). The defendants collectively raise seven claims on appeal.    For the reasons discussed below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

Copeland and Hartwell ("the defendants") were alleged to be members of an elaborate drug operation in the Flint, Michigan area.  On September 1, 1999, the defendants were charged in a three-count indictment by the grand jury.  Count One alleged that both defendants "did knowingly, intentionally, and unlawfully conspire, combine, confederate and agree with each other and other persons, both known and unknown to the Grand Jury, to distribute cocaine, a Schedule II controlled substance, and marijuana, a Schedule I controlled substance, in violation of U.S.C. §§ 846 and 841(a)(1)."  Count Two alleged that Hartwell possessed a

weapon while being a felon in violation of 18 U.S.C. § 922(g), based upon the discovery of a weapon in Hartwell's vehicle on June 30, 1999. Count Three alleged that Copeland was also in unlawful possession of a weapon under 18 U.S.C. § 922(g), arising out of the same event.

A joint trial for the defendants commenced on April 5, 2000. At trial, the government introduced evidence seized in two searches. First, the government introduced evidence recovered from the defendants' vehicle pursuant to a traffic stop of the defendants on June 30, 1999 for illegal parking. After conducting a stop of the vehicle, Michigan State Troopers obtained the defendants' consent to search the vehicle; the officers recovered two stolen weapons and a sheet of paper which appeared to have drug tabulations recorded on it. Detective Michelle Dunkerley, a forensic document examiner, testified at trial that these notations were likely made by Hartwell.

The government also presented evidence recovered pursuant to a search warrant executed on July 9, 1999. The warrant authorized searches of several properties in Flint that were thought to be frequented by the defendants for the purposes of drug activity. Officers recovered a quantity of ammunition and a glass jar that is typically used for "cooking" cocaine, that is, converting powder cocaine into crack cocaine. The jar was later discovered to possess traces of cocaine base residue. Officers also seized papers containing drug tabulations reflecting the sale of numerous ounces of powder and crack cocaine. Detective Dunkerley testified that portions of these tabulations likely were made by the defendants.

In addition to this physical evidence, the government introduced extensive testimony by individuals who knew the defendants to be involved in both the sale and possession of drugs in Flint. Most notably, the government introduced the testimony of Joey Williams, a convicted drug dealer who claimed to have worked with both of the defendants. Hoping to obtain a downward departure in his own pending drug

sentence, Williams provided extensive testimony about his involvement with the defendants in the distribution of powder and crack cocaine since 1986. Williams testified that, until his incarceration for drug charges in 1988, he and Hartwell frequented several drug houses in Flint at which they prepared cocaine and crack cocaine for distribution. Williams testified that upon his release from prison in 1994, he found that Hartwell was still actively involved in the distribution of drugs and had developed contacts with a drug supplier in Detroit. Williams testified that he later met Copeland in 1995 at a house on Russell Street, and the three soon began "cooking" cocaine and distributing it at various locations in Flint. Williams estimated that over the course of the charged conspiracy, he and Hartwell distributed hundreds of ounces of cocaine, about eighty percent of which was crack cocaine. Williams also estimated that he and Copeland distributed hundreds of ounces of cocaine, about twenty to thirty percent of which was crack cocaine.

In addition to Williams's testimony, the government also introduced the testimony of JaJuan Gardner, who testified that he had purchased drugs on two occasions from Hartwell. The government also presented the testimony of police officers who had arrested Copeland on three occasions for possession of a controlled substance.

At the close of the government's case, the defendants moved for judgment of acquittal, which the district court denied. On April 17, 2000, the jury returned guilty verdicts on all three counts. The probation office prepared Presentence Investigation Reports recommending that the defendants be sentenced to a range of twenty years to life. The district court ultimately sentenced Copeland to a term of thirty years and Hartwell to a life sentence.

On December 11, 2000, the district court entered findings of guilty against the defendants. The defendants now collectively raise seven grounds for appeal, each arising out of various stages of their trial. In particular, the defendants claim that the district court erred during the pre-trial stage by

### III. CONCLUSION

For the aforementioned reasons, we **AFFIRM** the convictions and sentences of the defendants.

highest number possible"); *Milledge*, 109 F.3d at 317 (requiring "evidence of particularized findings"). The district court's determination must ultimately be supported by a preponderance of the evidence. *Zimmer*, 14 F.3d at 290; *Meacham*, 27 F.3d at 216.

The district court based its determination of Copeland's base offense level from both Williams's testimony and, to a lesser extent, the amounts of drugs involved in Copeland's three arrests for drug possession. Williams testified that from the period that Copeland joined the conspiracy, around 1995, until Williams was incarcerated in 1998, Copeland was involved in the distribution of "hundreds of ounces" of cocaine, twenty to thirty percent of which was crack cocaine. At sentencing, the district court determined that "hundreds of ounces" must equal at the very minimum two hundred ounces, and that twenty percent of this amount would be forty ounces, or approximately 1,132 grams. The district court held Copeland accountable for 1,132 grams of crack cocaine, placing him within the 500 to 1500 gram range, thus earning him a base offense level of 36.

Copeland challenges the district court's conclusion on the basis that Williams's testimony was not credible and, in the alternative, that Williams did not mean to hold Copeland accountable for that quantity of drugs. Based upon the record, we find no clear error in the district court's findings. The record is clear that Williams believed Copeland to be responsible for distributing hundreds of ounces of cocaine, twenty to thirty percent of which was crack cocaine. In addition, the drug tabulations that were recovered from Copeland's residence reflected the sale of dozens of ounces of crack and powder cocaine. The district court made a conservative assessment of drug quantity on the basis of this evidence -- testimony that both the court, and presumably the jury, found to be credible. We find no error in the district court's analysis, and thus its findings as to drug quantity under the Sentencing Guidelines are affirmed.

(1) finding that probable cause existed to stop the defendants on June 30, 1999 based upon an antecedent parking violation. Copeland separately claims that at this stage of the trial the district court committed reversible error by (2) permitting the government to introduce Copeland's three prior arrests for drug possession under FED. R. EVID. 404(b); (3) permitting the government to introduce statements by the defendants that they wanted to "get" the prosecutor as evidence of consciousness of guilt; and (4) permitting the government to improperly exercise a peremptory challenge in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Hartwell separately claims that the district court erred during the guilt phase of trial by (5) finding there existed sufficient evidence to demonstrate his involvement in the conspiracy. The defendants also urge that the district court erred at sentencing by (6) increasing their sentences based upon factual findings that were not proved beyond a reasonable doubt, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Copeland separately claims that the district court erred by (7) calculating an excessive drug quantity attributable to him under the Sentencing Guidelines.

## II. DISCUSSION

### A. Pre-Trial Claims

*Motion to Suppress*

The defendants appeal the district court's denial of their motion to suppress evidence recovered from their vehicle on June 30, 1999, including two stolen weapons and a sheet of paper containing drug tabulations in Hartwell's handwriting. The defendants argue that the officers lacked probable cause to stop their vehicle, and therefore the brief detention of the vehicle constituted an unlawful stop in violation of the Fourth Amendment.

At the suppression hearing, Michigan State Troopers Weber and Gillett ("the officers") testified that at around 1 a.m. on June 30, 1999, they observed the defendants inside a vehicle with its parking lights on, parked on the wrong side of the

road at a 45-degree angle to the curb.  The officers testified that they intended to stop the defendants in order to issue the driver a parking citation.  However, while the officers were halted at a stop sign on Pasadena Avenue, a short distance from the defendants' vehicle on Milbourne Avenue, the defendants pulled away from the curb and resumed driving south along Milbourne Avenue at the legal speed.  As the officers turned south on Milbourne, another car pulled out of the driveway in front of the officers and also proceeded southbound, between the defendants' vehicle and that of the officers.   The officers followed the defendants' vehicle, although they did not activate their patrol lights.  According to the officers, after following the defendants for about a mile, the third car turned off of Milbourne.  The officers then activated their patrol lights and stopped the defendants.  Upon smelling alcohol in the vehicle and observing alcohol in plain sight, the officers placed Hartwell under arrest and searched the defendants and the vehicle.  The officers retrieved two stolen firearms and a sheet containing drug tabulations. The officers issued two traffic citations to the defendants:  a citation for improper parking under MICH. COMP. L. § 257.675[1] and a citation for open intoxicants under MICH. COMP. L. § 257.624(a)[2].  The defendants were ultimately placed under arrest for transporting open intoxicants.

The defendants jointly moved to suppress the evidence recovered from Hartwell's vehicle during the course of this stop and search.  When reviewing a motion to suppress, this

---

[1]"Except as otherwise provided in this section and this chapter, a vehicle stopped or parked upon a highway or street shall be stopped or parked with the wheels of the vehicle parallel to the roadway and within 12 inches of any curb existing at the right of the vehicle."  MICH. COMP. L. § 257.675(1).

[2]"(1) Except as provided in subsection (2), a person who is an operator or occupant shall not transport or possess alcoholic liquor in a container that is open or uncapped or upon which the seal is broken within the passenger compartment of a vehicle upon a highway . . . ."  MICH. COMP. L. § 257.624(a).

introduced the testimony of Gardner, who testified that he purchased four and a half ounces -- over 120 grams -- of crack cocaine from Hartwell on a single occasion.  Moreover, Williams testified that he and Hartwell were involved in the sale of "hundreds" of ounces of narcotics, about eighty percent of which was crack cocaine.  Even construing this largely uncontroverted evidence conservatively, there is overwhelming evidence in the record that demonstrates that Hartwell was responsible for the distribution of at least five grams of crack cocaine.  Because we have no doubt that, in light of this evidence, a jury would find Hartwell responsible for at least five grams of crack cocaine, we find that the government has sustained its burden under Fed. R. Crim. P. 52(a) in demonstrating the *Apprendi* error here to be harmless beyond a reasonable doubt.  We are convinced that Hartwell's rights were not affected substantially by the error, and thus we decline to correct any *Apprendi* error that occurred in the proceedings below.

*Determination of Drug Quantity Under the Sentencing Guidelines*

Copeland also challenges the district court's assessment of drug quantity in determining his sentence under the Sentencing Guidelines.

We review a district court's calculation of the amount of drugs under the Sentencing Guidelines for clear error.  *See United States v. Milledge*, 109 F.3d 312, 316 (6th Cir. 1996). "In calculating a defendant's base offense level under the Sentencing Guidelines, the sentencing court must consider those quantities of drugs that are part of the same course of conduct or common scheme or plan." *Id.* (quoting *United States v. Zimmer*, 14 F.3d 286, 290 (6th Cir. 1994)).  Where the amount of drugs is uncertain, the district court is required to "err on the side of caution and only hold the defendant responsible for that quantity of drugs for which the defendant is more likely than not actually responsible." *United States v. Meacham*, 27 F.3d 214, 216 (6th Cir. 1994); *see also Zimmer*, 14 F.3d at 290 (the district court "is not free to estimate the

statutory scheme, § 841(b)(1)(C), within a range of up to thirty years imprisonment.[8]

This argument clearly has merit. While, like Copeland, Hartwell was sentenced pursuant to § 841(b)(1)(B) based upon drug quantities that the court itself assessed based upon a preponderance of evidence, unlike Copeland, Hartwell was sentenced well in excess of § 841(b)(1)(C). Because Hartwell was sentenced beyond the applicable statutory range, the *Harris* Court's findings regarding mandatory minimums are inapplicable. *See Harris*, 122 S.Ct. at 2414. We do not read *Harris* to impact this court's holdings regarding the relevance of *Apprendi* where a defendant is sentenced beyond the applicable statutory range. Therefore, in sentencing Hartwell beyond the range of § 841(b)(1)(C), the district court inappropriately considered drug quantities not proved beyond a reasonable doubt. This is a quintessential *Apprendi* violation.

However, our inquiry does not end here. Under this court's recent proclamation in *Stewart*, we are required to determine whether the error committed at sentencing was harmless. That is, this court must consider whether, in light of the entire record, the government has demonstrated beyond a reasonable doubt that the jury would have found Hartwell to be culpable for conspiring to distribute five or more grams of crack cocaine. We believe that in light of the record before us, the error committed at sentencing was harmless. At trial, the government introduced a multitude of evidence that demonstrates that Hartwell conspired to distribute at least five grams of crack cocaine. In addition to introducing a number of drug tabulation notebooks reflecting the sale of dozens of ounces of powder and crack cocaine, the government also

---

[8]Hartwell and Copeland also argue on appeal that their sentences should be vacated under *Apprendi* because the sentencing enhancements applied were not proved beyond a reasonable doubt. However, this court has held that *Apprendi* does not remove the discretion of the district judge in determining sentencing enhancements. *See United States v. Schulte*, 264 F.3d 656, 660 (6th Cir. 2001). Thus, this argument is without merit.

court reviews the factual findings of the district court for clear error and considers conclusions of law *de novo*. *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). A factual finding is clearly erroneous if, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gort-DiDonato*, 109 F.3d 318, 320 (6th Cir. 1997).

The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., amend. IV. The temporary stop and detention of a vehicle and its passengers, even for a brief period of time, can constitute an unlawful "seizure" under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979) ("The Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief."). The Supreme Court has determined that a police officer's stop of a vehicle is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). This reasonableness requirement is satisfied where government interests in conducting the stop outweigh individual privacy interests. *Prouse*, 440 U.S. at 654 ("Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."). In general, under this test, an automobile stop is considered reasonable "where the police have probable cause to believe that a traffic violation has occurred."[3] *Whren*, 517 U.S. at 810.

---

[3]As a general matter, the reasonableness inquiry is satisfied once a court determines that the police officer has acted on the basis of probable cause. However, in circumstances involving "searches or seizures conducted in an extraordinary manner," courts are still obligated to

Probable cause is generally defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). The probable cause doctrine "is a flexible, commonsense standard [that] requires that the facts available to the officer would warrant a man of reasonable caution" to believe that a crime is afoot. *Id.* (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal quotations omitted)). In determining whether probable cause exists, a court must examine the totality of the circumstances from the perspective of the officer at the time of the incident. *Ferguson*, 8 F.3d at 391 ("We note that the probable cause determination, like all probable cause determinations, is fact-dependent and will turn on what the officer knew *at the time he made the stop.*"). Indeed, probable cause determinations are not entitled to the benefit of hindsight; "[i]f an officer testifies at a suppression hearing that he in fact did not see the traffic violation or did not have probable cause to believe a violation had occurred, but only discovered after the stop or the arrest that the suspect had committed a traffic violation, a court could not find that probable cause existed." *Id.* Relatedly, probable cause is said to exist where an officer reasonably believes that an individual has committed a violation, even if in hindsight this was not the case. *Id.; see also Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) ("Probable cause is assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (quoting *Kostrzewa v. City of Troy,* 247 F.3d 633, 639 (6th Cir. 2001))).

Here, Hartwell and Copeland argued before the district court that the stop of their vehicle for a completed parking

conduct the balance-of-interests test, irrespective of a finding of probable cause. *Wren*, 517 U.S. at 818. Such circumstances include "seizure by means of deadly force, unannounced entry into a home, entry into a home without a warrant, or physical penetration of the body." *Id.* (internal citations omitted). Because such a situation is not implicated here, our inquiry is appropriately limited to a finding of probable cause.

five or more grams of crack involved in the conspiracy. It is clear that the district court did not intend to sentence Copeland pursuant to the statutory range of § 841(b)(1)(C), as required by *Ramirez*.

Nonetheless, the district court sentenced Copeland to a term of years encompassed by § 841(b)(1)(C). Under *Harris*, because Copeland was not sentenced beyond the statutory range of § 841(b)(1)(C), the fact that the district court sentenced Copeland based in part on factual findings not proved beyond a reasonable doubt does not rise to a constitutional violation under *Apprendi*. *See Harris*, 122 S.Ct. at 2415 ("If the facts judges consider when exercising their discretion within the statutory range are not elements, they do not become as much merely because legislatures require the judge to impose a minimum sentence when those facts are found -- a sentence the judge could have imposed absent the finding."). In reaching a verdict of guilty, the jury authorized the district court to impose a sentence of up to thirty years under § 841(b)(1)(C). That the district court considered drug quantities established by a mere preponderance in subjecting Copeland to a mandatory minimum sentence is irrelevant; because the district court remained within the confines of § 841(b)(1)(C), Copeland's due process and jury trial rights under *Apprendi* were not offended. Therefore, we find no error in the district court's imposition of a sentence of thirty years.

*Hartwell's Apprendi Claim*

The district court sentenced Hartwell to a term of life imprisonment pursuant to § 841(b)(1)(B). In doing so, the district court stated that "the Court in your case is required to impose a life sentence." Hartwell challenges the constitutionality of this sentence, urging that because drug quantity was not proved beyond a reasonable doubt, he should have been sentenced pursuant to the lowest tier of the

the lowest range of punishment under Title 21, United States Code, Section 841(b)." However, the district court rejected this argument and concluded that "the *Apprendi* decision does not apply to mandatory minimum sentencing schemes." The district court instead concluded that "[d]rug type and quantity are mere sentencing factors for that crime that a Judge may determine by a preponderance of the evidence at sentencing provided that the sentencing Judge does not exceed the penalty provision of Section 841(b)."

The district court then sentenced Copeland and Hartwell pursuant to the higher tiers of § 841(b).[7] The district court confirmed that in doing so, it was accepting the premise that the record established by "overwhelming evidence" that there were five grams or more of crack cocaine as part of the drug conspiracy.

*Copeland's Apprendi Claim*

The district court sentenced Copeland to a thirty year term pursuant to § 841(b)(1)(B). Copeland appeals, insisting that he should have been sentenced pursuant to the lowest tier of the statutory scheme, § 841(b)(1)(C), because drug quantity was not determined by the jury beyond a reasonable doubt. The government counters that because Copeland's sentence is within the statutory maximum of § 841(b)(1)(C), his sentence does not violate *Apprendi*.

This court must determine whether the district court erred in sentencing Copeland to thirty years, a prison term encompassed by both § 841(b)(1)(C) and the higher tiers of § 841, a question that we review *de novo*. The record indicates that the district court sentenced Copeland pursuant to § 841(b)(1)(B): the district court stated that it understood Copeland to be eligible for a life sentence and confirmed that its understanding was based upon evidence that there were

---

[7]The district court stated that "the statutory maximum . . . in Mr. Copeland's situation is life imprisonment [and] the statutory maximum in Mr. Hartwell's case is life imprisonment."

violation was unreasonable, and thus the officers lacked probable cause. The government countered that parking regulations are encompassed within Michigan's traffic laws, and thus, pursuant to *Whren*, the observation of a parking violation constitutes probable cause to conduct a stop. *See Whren*, 517 U.S. at 810. The district court agreed with the defendants that "a parking violation, *in and of itself*, would *not* provide a reasonable police officer with probable cause to believe that a person had committed a *traffic* offense." *Hartwell*, 67 F. Supp. 2d 784, 790 (E.D. Mich. 1999). The district court stated that it was unable to locate any legal support for the proposition that "a valid traffic stop had been premised on an antecedent parking violation," and thus concluded that the officers' stop of the vehicle on that basis was unreasonable. We thus must first consider whether the district court erred in finding that the observed parking violation did not constitute probable cause.

The issue of whether the holding in *Whren* extends to stops based upon an observed antecedent parking violation is one of first impression in this Circuit. This court has previously held that the probable cause standard of *Whren* is satisfied in three different contexts. First, in the largest class of cases, this court has held that a police officer has probable cause to stop a vehicle based upon an observed moving violation. *See, e.g., United States v. Johnson*, 242 F.3d 707 (6th Cir. 2001) (broken taillight); *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999) (speeding); *United States v. Wellman*, 185 F.3d 651 (6th Cir. 1999) (speeding); *United States v. Navarro-Camacho*, 185 F.3d 651 (6th Cir. 1999) (speeding); *United States v. Akram*, 165 F.3d 452 (6th Cir. 1999) (failure to signal a lane change); *United States v. Palomino*, 100 F.3d 446 (6th Cir. 1996) (driving too slowly and weaving in traffic).

Second, this court has found that the probable cause standard of *Whren* is satisfied where an officer observes a vehicle, either in motion or while stopped, that does not comply with the appropriate registration requirements. *See, e.g., United States v. Meyers*, 102 F.3d 227, 232 (6th Cir.

1996) (probable cause satisfied where officer temporarily detained driver in parked car with an expired license tag); *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996) (a police officer has probable cause to stop a vehicle that displayed an altered temporary license certificate, or "drive-out" tag).

Finally, this court has found that an officer has probable cause to stop a driver in the course of a parking violation. In *Meyers*, a police officer observed the defendants seated in an illegally parked car with an expired license tag. The *Meyers* court held that because the defendants were engaged in "two clear traffic violations," the officer had probable cause to temporarily detain the defendants to issue the citations, and, after recognizing one of the passengers as having an outstanding arrest warrant, place that passenger under arrest. *Meyers*, 102 F.2d at 232. Notably, the Michigan Supreme Court has also held that a police stop of an illegally parked vehicle under MICH. COMP. L. § 257.675 satisfies the Fourth Amendment. *People v. Ingram*, 312 N.W. 2d 652, 654 (Mich. 1981) (stop of defendant was justified by probable cause where the defendant was stopped while getting into his illegally parked vehicle).

The question before this court is whether the apprehension of the defendants *after* they had parked illegally is a reasonable stop under *Whren*. The district court found that a parking violation, by itself, does not constitute adequate grounds to stop a vehicle because it is not a traffic violation. *See Hartwell,* 67 F. Supp. 2d at 790. We disagree. The placement of the defendants' vehicle at a 45-degree angle to the curb, facing the wrong direction, clearly violates Michigan's parking regulations. *See* MICH. COMP. L. § 257.675(1) ("[A] vehicle stopped or parked upon a highway or street shall be stopped or parked with the wheels of the vehicle parallel to the roadway and within 12 inches of any curb existing at the right of the vehicle."). This parking regulation is set forth under the general traffic laws of the Michigan Vehicle Code. *See* MICH. COMP. L. § 257, CH. IV, OBEDIENCE TO AND EFFECT OF TRAFFIC LAWS. Moreover, the

*United States v. Stewart*, -- F.3d. -- , 2002 WL 1941171 (6th Cir. 2002). In *Stewart*, this court held that the government's failure to allege or prove drug quantity constitutes a trial error and is thus subject to harmless error review under Fed. R. Crim. P. 52(a). *Id.* at *18. Under that standard, the government bears the burden of showing that the error had no effect on a defendant's substantial rights. However, "[w]here a reviewing court, after examining the entire record, cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . . it should not find the error harmless." *Id.* at *18 (quoting *Neder v. United States*, 527 U.S. 1, 19 (2000)). Therefore, where the government can demonstrate beyond a reasonable doubt that the jury would have found the defendant liable for the drug quantity at issue in sentencing, this court must consider the error harmless and sustain the defendant's sentence. We now consider the defendants' *Apprendi* claims under this framework.

The indictment in this case charged Copeland and Hartwell with conspiracy to distribute controlled substances under 21 U.S.C. § 841(a), with no drug amount specified. Though different witnesses testified to the amount of drugs they purchased from or distributed with the defendants, the question of drug quantity was not submitted to the jury. Nonetheless, the Presentence Investigation Reports prepared for both Copeland and Hartwell recommended that the defendants be sentenced pursuant to § 841(b)(1)(A). At the sentencing hearing, both Copeland and Hartwell, through their counsel, made written and oral objections under *Apprendi*[6] to the district court's use of drug quantity not proved beyond a reasonable doubt. The district court acknowledged that "[t]he defendants each argue that because the jury did not find the drug type and quantity beyond a reasonable doubt in this case the Court must sentence them to

---

[6] *Apprendi* had recently been decided by the Supreme Court and therefore was a relatively new rule. The district court did not at that time have the benefit of this court's line of cases extending *Apprendi* to statutory ranges.

*Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravating crime-- and thus the domain of the jury--by those who framed the Bill of Rights. The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict has authorized the judge to impose the minimum with or without the finding.

*Id.* We read the Supreme Court's holding in *Harris* to modify this court's prior holdings regarding the applicability of *Apprendi* to mandatory minimums. That is, while *Harris* does not alter this court's well-established principle that, where drug quantity is not proved beyond a reasonable doubt, a defendant's sentence cannot *exceed* the statutory range set forth in § 841(b)(1)(C), *Harris* does modify our prior holdings such that a defendant cannot demonstrate an *Apprendi* violation where he has been sentenced to a term of years *encompassed* by § 841(b)(1)(C). Thus, where a defendant is made subject to a higher range of punishment under §§ 841(b)(1)(A) and (B) but is nonetheless sentenced within the confines of § 841(b)(1)(C), his rights under *Apprendi* are not violated.

This court has also recently determined that even where a defendant can demonstrate that drug quantity was not alleged in the indictment and he was sentenced to a term of years beyond that encompassed by § 841(b)(1)(C), the district court's error in sentencing may nonetheless be harmless. *See*

_____

sentences, and thus consider that holding to be binding. *See United States v. Solis*, -- F.3d. --, 2002 WL 1584896, at *18 (5th Cir. July 18, 2002) ("We need not do so, however, because the contention that *Apprendi* applies to mandatory minimums is meritless in light of the Supreme Court's recent decision in *Harris v. United States*"); *United States v. Avery*, -- F.3d --, 2002 WL 1462849, at *8 (10th Cir. July 9, 2002 ) ("Recently, however, the Supreme Court ruled that *Apprendi*'s rationale does not apply where a fact increases a defendant's mandatory minimum sentence but does not increase the maximum statutory penalty facing a defendant.").

Michigan Vehicle Code provides that officers may enforce any of the regulations subsumed in this section by virtue of a stop. *See* MICH. COMP. L. § 257.742(1) ("A police officer who witnesses a person violating this act or a local ordinance substantially corresponding to this act . . . may stop the person, detain the person temporarily for purposes of making a record of vehicle check . . . ."). It is clear, then, that an officer can effect a stop based upon a driver's failure to comply with Michigan's parking regulations, even if the vehicle is no longer parked. Thus, an antecedent parking violation can conceivably form the basis for probable cause to stop a vehicle.

However, our inquiry does not end here. Although an officer may effect a stop of a vehicle for parking illegally, that stop is nonetheless subject to the general reasonableness requirements of *Whren*. In particular, where an officer is in possession of information that creates the basis for probable cause, he is required to act upon this information within a reasonable period of time -- otherwise the existence of probable cause is said to have become stale. *See United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988). Whether the facts creating the basis for probable cause have become stale is directly related to the nature of those facts. *Id.* ("In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime[.]") (quoting *United States v. Haimowitz*, 706 F.2d 1549, 1554-55 (11th Cir.1983)); *see also United States v. Akram*, 165 F.3d 452, 456 (6th Cir. 1999) ("To determine whether evidence establishing probable cause is 'stale,' we consider the inherent nature of the suspected crime . . . ."). Logically, where an observed parking violation is not ongoing, an officer is required to effect a stop based upon this conduct within a reasonable period of time. Because a parking violation necessarily takes place only when a vehicle is stopped or standing, the time in which a moving vehicle can reasonably be stopped for a parking violation is relatively limited.

Under this framework, we conclude that the stop of the defendants one mile from their parked location was

reasonable. Upon observing the defendants illegally parked, both officers testified that they immediately circled the block to further investigate. Furthermore, even though the officers did not immediately stop the defendants as they began their pursuit, the officers explained that a third car had entered the road between the defendants' vehicle and the patrol car. Once this third vehicle turned off the road, the officers testified that they activated their patrol lights and stopped the defendants. Given the circumstances surrounding this stop, including the presence of a third vehicle and the relatively short distance in which the officers followed the defendants prior to conducting the stop, we find that the stop of the vehicle was reasonable. Therefore, the evidence recovered by the officers in the course of this stop was properly admitted into evidence.

While the district court rejected the existence of probable cause on the basis of the parking violation, that court found that the government's proffered additional bases for probable case -- two moving violations noted by the officers *after* the incident -- were sufficient to deny the defendants' motion to suppress. *See Hartwell,* 67 F. Supp. 2d at 790 ("Accordingly, the initial parking violation relied upon by the government did not provide the troopers with probable cause to stop defendant Hartwell's vehicle. *Nevertheless*, the government now urges this Court to consider other additional violations allegedly committed by defendant Hartwell."). In particular, the government argued that in parking the vehicle as they did, the defendants necessarily obstructed traffic and drove on the wrong side of the road. On appeal, the defendants argue that the government is precluded from advancing additional bases for probable cause with the benefit of hindsight. *See Ferguson,* 8 F.3d at 391-92 (holding that probable cause determinations "turn on what the officer knew *at the time he made the stop.*"). The government counters that *Whren* provides that the objective presence of probable cause justifies a stop, regardless of an officer's subjective intentions in conducting such a stop. *See Whren*, 517 U.S. 806 at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Because we have already determined that the officers acted on the basis of

is not proved, and a defendant is sentenced to a term of years encompassed by both the lowest and highest tiers of the scheme, this court has found that this may constitute an *Apprendi* violation if the defendant can demonstrate that he was sentenced pursuant to one of the higher tiers of the statute. *See United States v. Humphrey*, 287 F.3d 422, 450 (6th Cir. 2002) ("[I]f evidence in the record indicates that the judge thought herself constrained to sentence the defendant within the higher statutory range, such evidence will demonstrate a potential *Apprendi* violation"). Stated differently, this court has held that a defendant's rights under *Apprendi* are violated wherever he is made subject to a mandatory minimum sentence of the higher tiers of § 841(b), even where he is sentenced within range set forth in § 841(b)(1)(C).

Recently, however, the Supreme Court has considered the application of *Apprendi* to mandatory minimum sentences. *Harris v. United States*, --- U.S.---, 122 S.Ct. 2406, 2414 (2002). The Court concluded that a defendant's rights under *Apprendi* are not offended where a fact that is not proved beyond a reasonable doubt increases a defendant's mandatory minimum sentence but does not increase the maximum statutory range. *Id.* at 2414. The Court reasoned that while the use of a factual finding not proved beyond a reasonable doubt cannot be used to sentence a defendant beyond the applicable statutory maximum, a district court is authorized to use such a fact to sentence a defendant within a higher range as long as that sentence is also encompassed by the lower tiers of the scheme. Justice Kennedy, writing for a plurality of the Court,[5] reasoned that,

---

[5]Justice Kennedy wrote the majority opinion in *Harris,* though the portion of the opinion finding that *Apprendi* does not apply to mandatory minimums was joined by the Chief Justice and Justices O'Connor and Scalia. *See Harris*, 122 S.Ct. At 2409. Justice Breyer wrote a separate concurring opinion in which he joined Justice Kennedy's opinion "to the extent that it holds that *Apprendi* does not apply to mandatory minimums." *Id.* at 2421. We read Justice Breyer's agreement with this portion of Justice Kennedy's opinion to indicate that a majority of the Justices agree that *Apprendi* does not apply to mandatory minimum

that increase a penalty from . . . a lesser to a greater minimum sentence, are now elements of a crime to be charged and proved."); *United States v. Flowal*, 234, F.3d 932, 938 (6th Cir. 2000) ("The prosecution is only entitled to the punishment provisions of a crime whose elements it has proved to a jury beyond a reasonable doubt."). *But see Harris v. United States* --- U.S.---, 122 S.Ct. 2406, 2414 (2002) (rendering *Apprendi* inapplicable to those cases where the mandatory minimum, but not the statutory maximum, is increased).

The defendants were convicted under 21 U.S.C. § 841. Under that statutory scheme, defendants are made subject to varying statutory ranges based upon the quantity of drugs involved. Where a defendant has a prior felony drug conviction, and possesses, manufactures, or distributes 50 grams or more of crack, he is subject to a sentence of twenty years to life. 21 U.S.C. § 841(b)(1)(A). If a defendant has a prior felony drug conviction and possesses, manufactures, or distributes 5 grams or more of crack, he is subject to a sentence of ten years to life. 21 U.S.C. § 841(b)(1)(B). If a defendant has a prior felony drug conviction and simply possesses, manufactures, or distributes "a controlled substance in schedule II," with no specified quantity, he is subject to a maximum sentence of thirty years with no statutory minimum. 21 U.S.C. § 841(b)(1)(C).

In considering this statutory scheme under *Apprendi*, this court has held that where a defendant is sentenced under the higher tiers of this scheme, that is, §§ 841(b)(1)(A) and (B), the quantity of drugs involved must be charged in the indictment and proved beyond a reasonable doubt; otherwise, the defendant should be sentenced to the lower sentencing range of § 841(b)(1)(C). *See Ramirez*, 242 F.3d at 352 ("[w]hen a defendant is found guilty of violating 21 U.S.C. § 841(a)(1), he must be sentenced under 21 U.S.C. § 841(b)(1)(C) unless the jury has found beyond a reasonable doubt that the defendant possessed the minimum amounts required by § 841(b)(1)(A) and § 841(b)(1)(B)"); s*ee also Flowal,* 234 F.3d at 936. Furthermore, where drug quantity

probable cause by stopping the defendants for a parking violation, we need not reach this issue. We thus affirm the finding of probable cause to stop the vehicle based solely on the observed parking violation.

*Motion in Limine*

*Introduction of Copeland's Three Prior Arrests*

At trial, the Government sought to introduce Copeland's three prior arrests for drug possession, all of which took place during the course of the charged conspiracy. Officers arrested Copeland on August 27, 1996 for possession of 6.13 grams of powder cocaine. Copeland was also arrested on September 13, 1996 for possession of 2.16 grams of powder cocaine, at which time the police recovered from Copeland's person a .380 caliber handgun, a pager, and $90 cash. On October 8, 1997, Copeland was arrested a third time at an illegal dice game for possession of marijuana; Copeland was carrying $463 cash at the time. The government argued that these arrests were consistent with Copeland's involvement in a drug conspiracy, and sought to introduce them as evidence of his guilt.

Copeland filed a motion in limine, seeking to exclude this evidence on the basis of FED. R. EVID. 404(b). Copeland argued before the district court that the amounts involved in these arrests were not consistent with distribution, and that the introduction of these prior bad acts would unfairly prejudice him. The district court disagreed and held that these arrests were probative of Copeland's involvement in the conspiracy and thus admissible. Copeland now appeals.

This court reviews a district court's evidentiary determinations under FED. R. EVID. 404(b) for abuse of discretion. *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002). A district court is considered to have abused its discretion when this court is "left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the

relevant factors." *Id.* (quoting *Huey v. Stine*, 230 F.3d 226, 228 (6th Cir. 2000)).

In determining the admissibility of evidence of prior bad acts under FED. R. EVID. 404(b), a district court must examine three factors. First, the district court must decide "whether there is sufficient evidence that the other act in question actually occurred." *Haywood*, 280 F.3d at 720. Next, the court must determine whether the prior acts are probative of a material issue other than character. *Id.* (quoting *United States v. Johnson,* 27 F.3d 1186, 1191 (6th Cir. 2001)). Finally, the court must assess whether the probative value of the evidence is outweighed by the prejudicial impact it may have on the jury. *Id.*

We find that the district court did not abuse its discretion in finding that Copeland's prior arrests could appropriately be admitted to demonstrate guilt. As to the first prong of this inquiry, there is more than sufficient evidence that these arrests occurred, as Copeland concedes that he was arrested three times during the charged conspiracy and does not dispute any of the details surrounding these arrests.

Furthermore, the district court did not abuse its discretion in concluding that Copeland's arrests are probative of his guilt. "Evidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *Haywood*, 280 F.3d at 720. In order to establish a drug conspiracy pursuant to 21 U.S.C. § 846, the government must prove "that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it." *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986). This court has held that drug arrests that take place during the course of the charged conspiracy, even for mere possession, can contribute to a showing of participation in the conspiracy. *See United States v. Barrett*, 933 F.2d 355, 359 (6th Cir. 1991) (finding evidence sufficient to sustain drug conspiracy

Viewing this evidence in the light most favorable to the government, there was sufficient evidence that Hartwell was actively involved in the charged conspiracy. Williams testified that Hartwell was engaged in innumerable drug transactions, sometimes up to a dozen per day. According to Williams, Hartwell was the supplier to a crack house and had drug contacts throughout Flint and in Detroit. This evidence is consistent with the drug amounts recorded in drug tabulation documents recovered in Hartwell's car and in drug houses he was thought to frequent. This testimony is also consistent with the drug paraphernalia recovered pursuant to the July 9, 1999 search warrant. Considered cumulatively, this evidence would almost certainly lead the jury to conclude that Hartwell was knowingly and voluntarily involved in a drug conspiracy. As such, the verdict must stand.

## C.   Sentencing Claims

*Apprendi Claims*

Both Hartwell and Copeland claim that the district court's determination of their sentences violated their Fifth and Sixth Amendment rights under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). This court reviews a constitutional challenge to a defendant's sentence *de novo* wherever the defendant preserves the claim for appellate review. Where a defendant fails to make an *Apprendi* objection, this court must review the claim for plain error. *See United States v. Strayhorn*, 250 F.3d 462, 467 (6th Cir. 2001).

In *Apprendi*, the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. This court has held that where a defendant is subject to different statutory ranges based upon different elements of a crime, each and every element that can potentially increase a defendant's sentencing range must be presented to the jury and proved beyond a reasonable doubt. *See United States v. Ramirez*, 242 F.3d 348, 351-52 (6th Cir. 2001) ("Aggravating factors, other than a prior conviction,

161-62. Testimony by co-conspirators alone can be sufficient to prove the existence of a conspiracy. *United States v. Meyer*, 803 F.2d 246, 248 (6th Cir.1986) ("[Co-conspirator's] testimony flatly contradicts Meyer's contention that he was unaware of the drug sale, and is sufficient to enable a reasonable person to find that Meyer conspired and aided and abetted in the illegal distribution of cocaine.").

At trial, the government introduced physical evidence and direct testimony as to Hartwell's involvement in the drug conspiracy. The government introduced recorded drug tabulations in Hartwell's handwriting that were found in the June 30, 1999 search of Hartwell's vehicle. The government also presented physical evidence that was discovered by police officers pursuant to the July 9, 1999 search warrant, including a "cooking" jar containing traces of cocaine base, a quantity of ammunition, and additional drug tabulations. In addition, Gardner testified that he had purchased significant quantities of powder and crack cocaine from Hartwell on two separate occasions.

However, perhaps the most persuasive evidence presented at trial was the testimony of the government's chief witness, Joey Williams. Williams, a drug dealer himself, gave extensive testimony about Hartwell's involvement in the drug industry in Flint. In particular, Williams testified that for years, he and Hartwell frequented several drug houses in Flint Michigan at which they "cooked" cocaine for distribution. Williams stated that when he and Hartwell were not dealing drugs together, he observed Hartwell preparing and selling drugs on a daily basis at numerous "drug houses" in Flint. Williams testified that he knew Hartwell to be in frequent contact with various suppliers, and that Hartwell himself was a supplier to a crack house that he referred to as "the little rock house." In all, Williams estimated that over the course of the charged conspiracy, he and Hartwell were engaged in the distribution of "hundreds of ounces" of cocaine, about eighty percent of which was crack cocaine.

conviction where evidence included arrest of defendant for possession); *United States v. Cutwright*, 1994 WL 43444, at * 3 (6th Cir. Feb. 14, 1994) (A defendant's "admitting possession of crack cocaine within the time frame of the indictment, is evidence of his participation in the instant conspiracy [under § 846]."). Here, Copeland's repeated arrests for drug possession, especially with the presence of a firearm, significant amounts of cash, and a pager, are relevant to the question of whether he knowingly and voluntarily participated in a drug conspiracy. We agree with the district court that this evidence is probative of guilt.

Finally, as to the third prong, Copeland argues that any probative value that can be construed from these arrests is outweighed by their prejudicial effect. In particular, Copeland argues that his arrests for possession are consistent with personal use and that the large amount of money recovered from his arrest of October 8, 1997 is consistent with his participation in the dice game. While these are viable defense theories, we find that they could be effectively explored during cross-examination. Any discernible prejudicial effect these arrests might have is minimized in light of the extensive evidence presented at trial that indicates Copeland's involvement in the conspiracy. Moreover, the prejudicial effect is substantially outweighed by the probative value of these arrests. We thus find no abuse of discretion by the district court in finding this evidence to be admissible.

*Statements by Hartwell and Copeland to "Get" the Assistant United States Attorney*

At trial, the government sought to introduce the testimony of Timothy Whitfield, a fellow inmate with whom the defendants shared a county jail cell in November 1999. Whitfield apprised the government by letter that he had overheard the defendants discuss their intention to pay someone $500 to "get," that is, harm, the Assistant United States Attorney, Mark Jones. Whitfield stated that the defendants planned to pay someone to follow Jones out of one

of the three exits at the federal courthouse in order to have Jones "stopped."

The defendants moved to exclude these statements as non-probative of guilt under FED. R. EVID. 404(b), and, in the alternative, unfairly prejudicial under FED. R. EVID. 403. The district court denied the defendants' motion, finding that the statements constituted evidence of spoliation and thus were admissible. Copeland now appeals; he concedes the probative value of the evidence yet argues that it is extremely prejudicial.

We review the district court's admission of the defendants' statements for abuse of discretion. *United States v. Talley,* 164 F.3d 989, 1000 (6th Cir. 1999). This court must determine whether the district court abused its discretion in considering the defendants' threats against Jones to be evidence of spoliation, and if it did, whether the statements nonetheless constitute relevant admissible evidence. "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum prejudicial value." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988) (quoting 1 Weinstein & Berger, WEINSTEIN'S EVIDENCE ¶ 403[03] (1982)).

Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction. BLACK'S LAW DICTIONARY 1401 (6th ed. 1990). This court has previously held that threats made against government witnesses or testifying co-defendants constitute evidence of spoliation. *See United States v. Fortson*, 194 F.3d 730, 737 (6th Cir. 1999) ("Spoilation [sic] evidence, including evidence that the defendant threatened a witness, is generally admissible because it is probative of consciousness of guilt." (quoting *United States v. Maddox,* 944 F.2d 1223, 1230 (6th Cir. 1991))). It is reasoned that threats against a witness constitute an effort by the defendant to tamper with the substance of the

discrimination. Without more, and in light of the evidence supporting the government's race-neutral justification for dismissing the juror, we cannot conclude that Copeland has demonstrated a factual basis for a *Batson* violation.[4] We thus find no error in the district court's determination that the prosecution did not commit a violation under *Batson*.

## B.   Claims at Trial

*Sufficiency of the Evidence Claim*

On appeal, Hartwell challenges his conviction on the basis that there was insufficient evidence introduced at trial to demonstrate that he participated in a drug conspiracy under 21 U.S.C. § 846. We find this claim to be without merit.

This court reviews a defendant's sufficiency of the evidence claim to consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Ables*, 167 F.3d 1021, 1032 (6th Cir. 1999). Circumstantial evidence by itself can support a defendant's conviction. *United States v. Owusu*, 199 F.3d 329, 341 (6th Cir. 2000).

To prove a conspiracy under 21 U.S.C. § 846, the government must establish the existence of a drug conspiracy, and that each defendant knew of and participated in that conspiracy. *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990). "Mere association with conspirators" is not ample proof under § 846; rather, the government must demonstrate that there existed a "tacit or material understanding among the parties" to conspire to manufacture or distribute drugs. *Id.* at

---

[4] The Government argues on appeal that Copeland waived his ability to challenge the prosecutor's use of a peremptory challenge as to Juror #118 because he failed to timely object . This court need not address that question, however, because the record is lacking in basis for a *Batson* claim.

The district court found this explanation to be race-neutral and proceeded with jury selection.

In *Batson*, the Supreme Court held that a prosecutor is precluded from exercising a peremptory challenge on the basis of race. Under *Batson,* once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination, the burden shifts to the government to demonstrate a race-neutral reason for the exclusion of the juror. The government is not required to persuade the court that its reasons for dismissing the juror were well-founded; rather, it need only demonstrate that its reasons were race-neutral. *United States v. Humphrey*, 287 F.3d 422, 438 (6th Cir. 2002). Once the government offers a race-neutral justification, "the challenging party must demonstrate that the purported explanation is merely a pretext for a racial motivation." *McCurdy v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001). The burden of persuasion always rests with the opponent of the strike. *Id.*

Copeland assigns error to the district court's determination that the government's reasons for excluding Juror #118 -- that he was preoccupied with his personal injury lawsuit -- were sufficiently race-neutral. Copeland argues that Juror #118 in fact did not appear to Copeland to be so preoccupied with his lawsuit that it would affect his performance as a juror. Copeland has nonetheless failed to sustain his burden under *Batson*. The government need only demonstrate a race-neutral justification for its exercise of a peremptory challenge of a juror; its reasons need not be persuasive nor plausible. *Humphrey*, 287 F.3d at 438. As the government has proffered such a reason, the burden remains with Copeland to demonstrate that the government's motives were discriminatory. Copeland has failed to make such a showing. The record indicates that the juror informed the court that he probably would be unavailable on some of the days of trial because of the need to attend to matters in his case. Furthermore, other than the fact that Juror #118 is Hispanic, Copeland has offered no evidence that his exclusion from the jury by the government was based upon purposeful

government's case, and thus are probative of a defendant's awareness that the government is likely to prevail at trial. *See United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986) ("The fact that defendant attempted to . . . threaten an adverse witness indicates his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit.") (quoting II Wigmore, EVIDENCE, § 278 (Chadbourn rev. 1979))). Thus, subject to the balancing of the statement's probative value and prejudicial effect pursuant to Fed. R. Evid. 403, threats against witnesses are usually considered admissible. *See, e.g. United States v. Martinez*, 1999 WL 55281 (6th Cir. Jan. 12, 1999) (defendant's proposition to fellow inmate to "get rid" of a witness); *United States v. Hanson*, 2000 WL 125863 (6th Cir. Jan. 25, 2000) (defendant's statements to former cellmate about hiring someone to kill co-defendant).

The government urges that the spoliation doctrine should extend to a defendant's threats against a prosecutor. The government argues that such threats are equally probative of an attempt to tamper with the government's case. We disagree, as threats against a prosecutor do not imply a defendant's intention to destroy evidence. Unlike a government witness, a prosecutor does not possesses specific knowledge about the defendant's acts to which he can testify under oath. Rather, the connection between the individual prosecutor assigned to the government's case and the substance of the government's case is relatively attenuated. By extension, threats to harm or kill a prosecutor are not necessarily probative of a defendant's intention to lessen any portion of the government's burden at trial. This is particularly true here, where there is no evidence in the record that suggests that the removal of Jones would have had a significant effect upon the government's success at trial. Because the defendants' threats do not indicate their intention to destroy government evidence, such threats do not per se constitute evidence of spoliation.

While the defendants' statements are not admissible as evidence of spoliation, they are nonetheless, to a limited extent, relevant. *See* FED. R. EVID. 401 ('Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence."). This court has held that evidence that has the tendency to demonstrate a defendant's consciousness of wrongdoing is admissible to establish the defendant's guilt. *United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir. 1993) ("Okayfor's possession of the counterfeit alien registration card was relevant evidence concerning Okayfor's consciousness of guilt . . . . "); *United States v. Copeland*, 51 F.3d 611, 617 (6th Cir. 1995); *United States v. Dillon*, 870 F.2d 1125, 1128 (6th Cir. 1989) (evidence of attempt to evade arrest is relevant to demonstrate a defendant's "guilty consciousness."). We think that, to a limited extent, the defendants' threats fall within this category of statements. There are many conceivable reasons why a defendant awaiting trial would threaten to harm the prosecutor, including simple frustration with being wrongly accused. Here, the record demonstrates that the defendants viewed Jones as the source of their legal troubles. The fact that the defendants threatened to "get" him could indicate that the defendants believed that Jones would succeed in obtaining guilty verdicts at trial. The statements thus possess some probative value as to the defendants' consciousness of guilt, but the lack of specificity linking the statements to the charged conduce permits only a weak inference.

The slight probative value of these statements notwithstanding, a court must still consider whether that probative value substantially outweighs any resulting prejudicial effect. *See* FED. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). *See also Paschal v. Flagstar Bank, FSB,* 295 F.3d 565, 579 (6th Cir. 2002). Here, the defendants' statements would cast an extremely negative light upon their characters. The statements have a tendency to cause the jury

to make impermissible inferences, including the fact that the defendants possess a violent nature and had previously served time in prison. Although these inferences are certainly permissible if the government had indicted the defendants for obstruction of justice, they are not relevant to the charged conduct. Given this imbalance, we find that the district court abused its discretion in determining that the prejudicial effect of defendants' threats against Jones was substantially outweighed by their probative value.

However, our finding of an abuse of discretion on the part of the district court is subject harmless error analysis under FED. R. CRIM. P. 52(a). Pursuant to that rule, this court is required to determine whether the error committed in the district court affected the defendants' substantial rights. We find that it did not. Given the extensive testimony and physical evidence presented at trial that indicates the defendants' culpability, the admission of these statements was harmless. We thus affirm the judgment of the district court as to this claim.

### Batson Challenge

Copeland argues that the government's use of a peremptory challenge to exclude a Hispanic juror violated his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986). We review a district court's determination of a *Batson* challenge with "great deference," under a clearly erroneous standard. *United States v. Buchanan*, 213 F.3d 302, 308-09 (6th Cir. 2000).

During voir dire, the government exercised a peremptory challenge to exclude Alternate Juror #118, a Hispanic man who indicated to the court that he was involved in a personal injury lawsuit and would likely have to attend a settlement conference during trial. When the juror was excused, Copeland did not object; however, at the close of voir dire, Copeland asked that the government proffer "some reasonable explanation" as to why the juror was excused. The government responded that Copeland waived any objection, yet stated that the government perceived Juror #118 to be inattentive and preoccupied with his personal injury lawsuit.