**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 19a0209n.06

Case Nos. 18-3083/3241

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

Apr 25, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| BORN MURRAY (18-3083); | ) | OHIO |
| ELSTARHEEM MURRAY (18-3241), | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: DAUGHTREY, COOK, and GRIFFIN, Circuit Judges.

COOK, Circuit Judge. After unsuccessfully fleeing from a traffic stop, Elstarheem Murray found himself in police custody, along with his brother Born Murray. A search of their car revealed two large batches of commercial checks stolen from the mail. The brothers claim that the district court should have suppressed those checks as evidence because officers seized them after an unreasonably extended traffic stop. Because the district court properly denied their suppression motions, we AFFIRM.

**I.**

Ohio State Highway Patrol Trooper Joseph Weeks stopped brothers Born and Elstarheem Murray twice on a November morning in 2016. As part of a drug-trafficking task force, Weeks patrolled a high-crime area in his marked cruiser but initiated traffic stops only at the request of

undercover agents surveilling a nearby hotel frequented by drug traffickers. So when an agent saw the brothers leave the hotel in a Chrysler sedan, he followed until Elstarheem executed an illegal lane change and then radioed Weeks to initiate a stop.

In his first encounter with the brothers, Weeks told Elstarheem, the driver, why he'd been stopped, then requested licenses from them both. Elstarheem nervously admitted to driving without a valid license but explained that they were seeking medical attention for Born's asthma. Weeks asked Elstarheem out of the vehicle while he ran a records check. It confirmed that Elstarheem was not licensed to drive and revealed the brothers' prior convictions; Elstarheem's involving narcotics and Born's for check fraud. After Born, who was licensed, agreed to drive, Weeks sent them off with a warning for the illegal lane change and directions to the nearest hospital.

Once released, the brothers never followed Weeks's directions to the hospital, returning instead to the hotel where surveillance continued. This time, undercover agents watched the brothers load luggage into a different vehicle before driving away. When Born, now in a Hyundai sedan, failed to stop at a red light before turning, the agents called on Weeks to initiate another traffic stop.

So about ninety minutes after their first encounter, Weeks again stopped the Murrays. As with the first stop, he asked the driver—this time, Born—to get out for a brief interview during which Weeks checked the vehicle's records back at his cruiser. Weeks directed Elstarheem to stay put with his hands on the dashboard. But as Weeks walked Born to his cruiser, Elstarheem bolted. With Born seated in the back of the cruiser but the door still ajar, Weeks gave chase and ordered Elstarheem to stop. Elstarheem heeded that command only after Weeks warned that he was armed with a taser.

Then, with both brothers secured in his cruiser, Weeks led his narcotics-detection canine around the Hyundai for a free-air sniff. The dog alerted to the trunk and arriving officers searched the car for drugs. They found none; however, officers did seize two envelopes holding roughly 150 commercial checks stolen from the mail.

Those checks, together worth approximately $1.5 million, provided the basis for charging Born and Elstarheem with possession of stolen mail and conspiracy to commit bank fraud and to possess stolen mail. *See* 18 U.S.C. §§ 2, 371, 1344, 1708. After the district court denied their motions to suppress the stolen checks, the brothers conditionally pleaded guilty. The district court sentenced each brother to 54-months' imprisonment. As permitted by their plea agreements, Born and Elstarheem appeal the rejection of their suppression motions.

## II.

To make their Fourth Amendment claim, the Murrays focus on the very short temporal window beginning when Weeks initiated the second traffic stop and ending with Elstarheem's flight from the Hyundai. They argue that during this period—less than one minute by all accounts—Weeks unlawfully detained them because he abandoned his traffic violation investigation "almost immediately" and asked Born out of the car to investigate drug trafficking without any reasonable suspicion supporting detention. If their detention exceeded its investigative scope, then the stolen checks must be suppressed as fruits of an illegal search. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). We review for clear error the district court's conclusion that Weeks lawfully detained the brothers before Elstarheem's flight, taking "the

evidence in the light most likely to support the district court's decision." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).

The Murrays do not argue that the traffic stop was unlawful at its outset—nor could they. Though Weeks admits the traffic violation was pretext to fish for drug-trafficking evidence, the constitutional reasonableness of the brothers' detention turns on Weeks's objective justifications, not his subjective motivation. *Whren v. United States*, 517 U.S. 806, 813–14 (1996). Born's failure to obey a red light suffices to render the stop lawful under the Fourth Amendment at its initiation. *See United States v. Copeland*, 321 F.3d 582, 593 (6th Cir. 2003).

But what starts as reasonable may become unreasonable in "its manner of execution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). As the brothers correctly note, the Fourth Amendment will not tolerate unrelated inquiries that measurably extend the duration of an otherwise lawful traffic stop. *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015). Thus, "[a] seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* at 1612 (internal quotation omitted). But, judging the record by that standard, this case is not close.

Critically, the district court found "it would not have been possible for Weeks to process and issue a traffic citation" in the "very brief passage of time" between his driver's side approach and Elstarheem's flight from the car. R. 35, PageID 258–59. In that one-minute interval, Weeks asked Born to exit the car, performed a consensual pat-down search, and was in the process of escorting Born to his cruiser when Elstarheem fled. Weeks had barely started at the tasks tied to issuing a traffic ticket, let alone the "ordinary inquiries incident to [a] traffic stop." *Rodriguez*, 135 S.Ct. at 1615 ("Typically such inquiries involve checking the driver's license, determining

whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."). True, Weeks's prior encounter with the brothers obviated some of these ordinary inquiries. But others remained, such as verifying proper registration and insurance for the Hyundai.

The Murrays's claim that Weeks abandoned his traffic-stop investigation to embark on another also lacks support in the record. They stress that Weeks had not yet questioned them about the traffic violation. An officer's failure to ask for a motorist's driver's license may suggest abandonment in some cases, but not here, given that Weeks verified Born's license during the first stop. Nor does Weeks's decision to order Born out of the car point to abandonment. *See United States v. Lash*, 665 F. App'x 428, 431 (6th Cir. 2016) ("Even without a reason to be suspicious, an officer may order the driver to get out of the vehicle during a traffic stop to ensure his own safety during the encounter." (internal quotation marks omitted)). The district court credited Weeks's testimony that—in light of the brothers' earlier story about the need to get to a hospital for an emergency that no longer appeared to exist—he removed Born from the car to separate the brothers while he figured out what was going on. The Murrays offer no argument that would allow us to set aside that finding as clearly erroneous.

### III.

As the district court concluded, Weeks lawfully detained the brothers before Elstarheem's flight—and reasonably pursued and seized the brothers thereafter. We AFFIRM.