RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0361P (6th Cir.)
File Name: 03a0361p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 02-5573

CANDY JENKINS,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 01-10057—James D. Todd, Chief District Judge.

Argued: September 10, 2003

Decided and Filed: October 9, 2003

Before: MOORE and GILMAN, Circuit Judges; MILLS,
District Judge.*

———————————

#### COUNSEL

**ARGUED:** M. Dianne Smothers, OFFICE OF THE
FEDERAL PUBLIC DEFENDER FOR THE WESTERN

———————————

* The Honorable Richard Mills, United States District Judge for the
Central District of Illinois, sitting by designation.

DISTRICT OF TENNESSEE, Memphis, Tennessee, for
Appellant. Victor L. Ivy, ASSISTANT UNITED STATES
ATTORNEY, Jackson, Tennessee, for Appellee.
**ON BRIEF:** M. Dianne Smothers, OFFICE OF THE
FEDERAL PUBLIC DEFENDER FOR THE WESTERN
DISTRICT OF TENNESSEE, Memphis, Tennessee, for
Appellant. Victor L. Ivy, ASSISTANT UNITED STATES
ATTORNEY, Jackson, Tennessee, for Appellee.

———————————

#### OPINION

———————————

RICHARD MILLS, District Judge. Candy Jenkins was
indicted and charged with one count of possession with the
intent to distribute fifty (50) grams or more of cocaine base
("crack") in violation of 21 U.S.C. § 841(a)(1).

Jenkins pleaded not guilty, was tried by a jury, and found
guilty.

On April 17, 2002, the district court sentenced her to 121
months of imprisonment, to be followed by five years of
supervised release.

On appeal, Jenkins challenges her conviction upon three
grounds and her sentence upon two. Specifically, Jenkins
argues that her conviction should be reversed: (1) because the
district court erred in admitting, pursuant to Federal Rule of
Evidence 803(6), five United States Postal Service express
mail package labels from packages which had been delivered
to her home prior to her arrest; (2) because the district court
erred in admitting, pursuant to Federal Rule of Evidence
404(b), evidence that she had used crack cocaine in the past;
and (3) because the Government failed to present sufficient
evidence at trial with which a reasonable jury could find her
to be guilty, beyond a reasonable doubt, of the offense
charged in the Indictment.

As for her sentence, Jenkins contends that the district court erred: (1) in denying her a reduction, pursuant to U.S.S.G. § 3B1.2, in her base offense level for being a minimal or minor participant; and (2) in denying her request to apply the safety-valve provision of U.S.S.G. § 5C1.2 and 18 U.S.C. § 3553(f)(1) - (5) to her sentence.

For the reasons set forth below, we **REVERSE** Jenkins' conviction and **REMAND** with instructions to dismiss the Indictment.

## I. BACKGROUND

On August 7, 2001, Mark Cooley, a supervisor at the United States Post Office in Union City, Tennessee, contacted United States Postal Inspector Bradley Kramer regarding a suspicious express mail package which was addressed to 813 College Street, Union City, Tennessee.[1] This address belonged to Candy Jenkins. Cooley contacted Kramer because he believed that the express mail package contained illegal drugs. Cooley informed Kramer that he believed that previous express mail packages delivered to this address also contained illegal drugs. Kramer instructed Cooley to deliver the package, to keep a log of all future express mail packages sent to this address, and to telephone him again about any further suspicious express mail packages which were sent to this address.

On August 11, 2001, Cooley telephoned Kramer and informed him that another suspicious express mail package had been sent to 813 College Street, Union City, Tennessee. Kramer instructed Cooley to again deliver the package to that address. This package had the same return address as the August 7, 2001, package.

---

[1] The return address listed on the express mail package was 3559 Alicia, Altadena, California, 91001. It was later determined that this address was a house that had been vacant for two years.

On August 29, 2001, Andy Gibson, a sergeant with the Union City Police Department, telephoned Kramer in order to discuss the two express mail packages which had been sent to 813 College Street, Union City, Tennessee. Kramer told Gibson that he was maintaining a file (as was the Union City Post Office) on the packages which were being sent to that address and that, when the next package was sent to that address, he would come to Union City in order to inspect the package and decide what to do next.

On September 25, 2001, Cooley contacted Kramer regarding another express mail package for the 813 College Street address. Kramer instructed Cooley to hold this package (which listed the same return address as the other express mail packages) for investigation. Kramer then went to Union City and examined the package. Kramer described the package as being "[l]ike one of those poly bags" rather than a cardboard envelope. Based upon the weights of the express mail packages, Kramer initially thought that the packages (including the present one) contained marijuana. However, based upon his experience, training, and further inspection of the current package, Kramer concluded that the package contained crack cocaine.

Accordingly, Gibson and K-9 officer Tac Simmons, along with his drug dog, CiCi, met Kramer at the Union City Post Office. Upon inspection, CiCi alerted on the package by making a pawing motion on it, thereby indicating the presence of drugs inside. Thereafter, Gibson telephoned other officers at the Union City Police Department and made arrangements to conduct a controlled delivery of the package.

Later that same day, Roger Burrus, an employee of the United States Postal Service, delivered the package to the residence at 813 College Street, Union City, Tennessee. Burrus went to the door and knocked. Candy Jenkins answered the door and signed for the package. Burrus gave the package to Jenkins and left, and Jenkins returned inside the residence.

At some point later, Jenkins exited her house, and Kramer and Gibson approached her. The two identified themselves as law enforcement officers and advised Jenkins of her constitutional rights.[2] Kramer and Gibson asked for Jenkins' consent to search her house, and she consented. Several law enforcement officers then went inside Jenkins' house and found the express mail package unopened and sitting on a chair in the living room. The officers asked Jenkins what she knew about the package, and she told them that she was receiving it for Sarah Johnson who was out of town. When the officers asked her who that person was, Jenkins replied that she really did not know Sarah Johnson very well.

After the law enforcement officers opened the package, and after they verified that it contained narcotics, Jenkins asked Kramer and Gibson if she could speak with them in private. Once the three had reached a back bedroom, Gibson asked Jenkins, "Candy, what are you doing here? What is this?" Jenkins replied, "What do you think it is?" Gibson responded, "I know what it is. It's a delivery of drugs, illegal drugs, and I'm very surprised that you are the one that it's being delivered to." Jenkins stated, "Yeah." Jenkins also advised Kramer and Gibson that her explanation of receiving the package for Sarah Johnson was not true; rather, Jenkins said that Carla "Rabbit" Johnson had contacted her to see if she would start accepting packages through the mail and that an individual known as Brian Ingram (a/k/a Brian Byars) would pick up the packages and give her $50.00 per package. Jenkins denied having knowledge of the contents of the package and estimated that she had received two packages per month from May until the present.

The law enforcement officers then placed Jenkins under arrest and transported her to the Obion County Jail. At the jail, Jenkins executed a Rights Waiver and gave the following written statement:

---

[2]Gibson knew Jenkins from prior contacts with her.

Probably in May 2001 Carla "Rabbit" Johnson called me and asked if I could get a package at my house through the U.S. Mail. She said it would be addressed to me. Packages started to be delivered probably in May, and I signed for them. In May, maybe one, two packages. In June, two packages, maybe every two to three weeks. Two in July. Two in August. Two in September. The second one is when the police came to my house. The only person who came and got the packages from me was Brian Ingram. He paid me fifty dollars for each U.S. Mail delivery to my apartment. He never said what was in them. I never asked, what was in them. I've known Brian maybe for twenty years, he is my friend. On 9/25/01, he came to my apartment two times and asked did the package come yet. I said no. I signed for the package. Brian drove up. I saw him, and he drove off, and the police came. I have never opened them. These were for Brian.

During the trial, the Government sought to introduce the mailing labels from the express mail packages which had previously been delivered to Jenkins' address. Jenkins objected to the labels' admission on two grounds: (1) the Government could not offer any proof as to what was inside of the packages and (2) the Government could not lay a proper foundation for the labels' admission. The Government responded that it could establish that these records were kept in the regular course of business at the Union City Post Office and were, therefore, admissible under the business records exception to the hearsay rule. The Government asserted that it could lay a proper foundation for the labels' admission through Kramer's testimony. The district court admitted the labels into evidence pursuant to the business records exception to the hearsay rule codified at Federal Rule of Evidence Rule 803(6).

In addition to offering testimony regarding the mailing labels, Kramer testified about the conversation which he had with Jenkins in her bedroom on September 25, 2001.

Specifically, Kramer told the jury that Jenkins had admitted to him that she had smoked crack cocaine in the past and that she was a current crack cocaine user. Jenkins denied, however, that Ingram was the source of her crack cocaine; rather, she stated that she obtained her crack cocaine from some guy down the street, although she did not want to reveal who that person was.

Jenkins objected to Kramer's testimony that she had admitted to him that she had smoked crack cocaine in the past and that she was a current crack cocaine user. Jenkins argued that this testimony constituted a prior bad act which was only offered to establish her character and propensity to commit the charged crime, and therefore, the evidence was inadmissible pursuant to Federal Rule of Evidence 404(b).

The district court, however, found that Kramer's testimony was admissible under Rule 404(b) because the Government had offered Kramer's testimony in order to establish Jenkins' knowledge that the express mail package contained crack cocaine, not in order to establish her character and propensity to commit the charged offense. The district court gave a limiting instruction to the jurors which cautioned them that the evidence was admissible only "to the extent that you may determine it might be relevant to the issue of knowledge" as to what was in the packages.

On January 15, 2001, the jury found Jenkins guilty of possession with the intent to distribute fifty (50) or more grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) as charged in the one count Indictment.

On April 17, 2002, the district court conducted Jenkins' sentencing hearing. At the hearing, the Government called Gibson, who read the written statement which Jenkins had given to the officers at the Obion County Jail after her arrest and called United States Probation Officer Mark Escue who offered testimony regarding Jenkins' relevant conduct (*i.e.*, the other express mail packages which she had received) and

regarding Jenkins' lack of acceptance of responsibility for her crime (*i.e.*, his belief that Jenkins had not given truthful information regarding her participation in the crime and, therefore, did not qualify for U.S.S.G. § 5C1.2's safety valve provision).

After considering the arguments and evidence, the district court sustained Jenkins' objection to the amount of drugs for which she was being held responsible as relevant conduct in her Presentence Report. Specifically, the district judge held that, although he personally believed that the other express mail packages sent to Jenkins contained crack cocaine, there was no evidence to substantiate his belief, and there was no evidence regarding the quantity of drugs contained within those packages. Accordingly, the district court held Jenkins accountable only for the amount of drugs found in the express mail package delivered to her house on September 25, 2001, (*i.e.*, 96.7 grams) and, thus, reduced her base offense level from 36 to 32.

However, the district court denied Jenkins' request that she receive a two-level reduction in her base offense level, pursuant to U.S.S.G. §3C1.2, for being a minimal or minor participant. In denying her request, the district court stated:

> Now, it's true that perhaps the receiver of the package is somewhat less culpable than the shipper of the package, but they're both necessary to make a package shipment work.
>
> If this had occurred one time, perhaps the defendant might have a better argument; but this occurred repeatedly over some months, and it's clear that the defendant was an active participant. So the defendant's request for a reduction in that regard is denied.

Finally, because the district court found Jenkins' adjusted offense level to be 32 and her criminal history category to be I, yielding a sentencing guideline range of 121 to 151 months

of imprisonment, the Court held that Jenkins' request to be sentenced pursuant to the safety valve provision of U.S.S.G. § 5C1.2 had become moot:

That makes the argument for the safety valve moot because a level 32 and a criminal history of I creates a sentencing range of 121 to 151, the minium of which is still above the ten-year mandatory minimum. So the safety valve provision becomes moot.

The district court went on to state:

But in the event it were not moot, the court would conclude that the defendant does not qualify for the safety valve because she has not truthfully admitted her responsibility for this conduct.

Accordingly, the district court sentenced Jenkins to 121 months of imprisonment, to be followed by a five year term of supervised release, for her conviction. On April 22, 2001, Jenkins filed a timely notice of appeal challenging her conviction and sentence.

## II. ANALYSIS

### A.  *MAILING LABELS*

Jenkins argues that the district court erred in admitting into evidence during the trial the mailing labels from the other express mail packages which she received at her home. Jenkins asserts that the labels constitute excludable hearsay for which no exception applies. Contrary to the district court's finding, Jenkins contends that the Government did not lay a proper foundation for the admission of the labels and claims that it did not establish that the business records exception to the hearsay rule applied because Kramer was not an "otherwise qualified witness" under Rule 803(6). Although Kramer testified that he was familiar with the fact that the Union City Post Office gave him the records which

he had requested, Jenkins claims that Kramer never indicated that he had an understanding about the record keeping system at the Union City Post Office. Without this knowledge, Jenkins claims that Kramer is neither a custodian nor an otherwise qualified witness as required by Rule 803(6).

The Government argues that Kramer qualifies under Rule 803(6) as an other qualified witness, and thus, the district court correctly admitted the labels pursuant to the business records exception to the hearsay rule. The Government asserts that it is clear from Kramer's testimony that he was aware of the record keeping procedures of the United States Postal Service. Moreover, Kramer testified that he was familiar with these business records based upon his training and experience. Finally, the Government notes that it was Kramer who instructed Cooley to maintain the very records in question and advised him on how to maintain the records. In any event, the Government argues that, if the district court erred in admitting this evidence, the admission constitutes harmless error which does not require reversal.

"In reviewing a trial court's evidentiary determinations, this court reviews *de novo* the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions." *United States v. Salgado*, 250 F.3d 438, 451 (6th Cir. 2001)(citing *United States v. Reed*, 167 F.3d 984, 987 (6th Cir. 1999).

As this Court has explained:

A business record must satisfy four requirements in order to be admissible under Rule 803(6):

(1) it must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the

transaction or from information transmitted by a person with knowledge.

*United States v. Weinstock*, 153 F.3d 272, 276 (6th Cir. 1998) (quoting *Redken Laboratories, Inc. v. Levin*, 843 F.2d 226, 229 (6th Cir.), *cert. denied*, 488 U.S. 852, 109 S. Ct. 137, 102 L. Ed.2d 110 (1988)). This information must be presented through "the testimony of the custodian or other qualified witness[.]" Fed. R. Evid. 803(6). Business records meeting these criteria are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id*.

"Rule 803(6) does not require that the custodian personally gather, input, and compile the information memorialized in a business record." *Weinstock*, 153 F.3d at 276. The custodian of the records need not be in control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's recordkeeping practices. *Id*. (*citing In re Custodian of Records of Variety Distrib., Inc.*, 927 F.2d 244, 248 (6th Cir. 1991)). Likewise, "[t]o be an 'other qualified witness,' it is not necessary that the person laying the foundation for the introduction of the business record have personal knowledge of their preparation." *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567, 575-76 (6th Cir. 1999).

*Salgado*, 250 F.3d at 451-52.

In the instant case, the district court correctly found that Kramer was an "otherwise qualified witness" under Rule 803(6). Kramer testified that he was familiar with these labels through his training and experience and that he commonly dealt with these records. Moreover, Kramer testified that he had instructed Cooley (*i.e.*, the individual from whom he had requested the production of these labels) on how to maintain these labels. Finally, Kramer testified

that he was maintaining a file on the suspicious express mail packages which were being sent to Jenkins' address which was similar to the file which was being kept at the Union City Post Office.

In order to be considered to be an "otherwise qualified witness" under Rule 803(6), "[a]ll that is required of the witness is that he or she is familiar with the record keeping procedures of the organization."*Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 576 (6th Cir. 1999). Kramer testified that he was familiar with the Union City Post Office's record keeping procedures with regard to the express mail package labels, and therefore, the district court did not abuse its discretion in admitting the labels pursuant to Rule 803(6).

### B.   PRIOR BAD ACTS

Jenkins next argues that the district court erred in admitting evidence, pursuant to Federal Rule of Evidence 404(b), that she had previously smoked and was a current user of crack cocaine. Jenkins asserts that the only evidence offered that she had smoked crack cocaine in the past was offered through the testimony of Kramer, and her admission to him was made in reference to the fact that she told Kramer that she obtained her crack cocaine from someone other than Ingram. Jenkins contends that no logical inference can be drawn from her statements to Kramer that she in any way acknowledged that she knew that Ingram was a crack cocaine dealer and, therefore, that she could have reasonably known that the packages which she received on his behalf contained crack cocaine. In short, Jenkins asserts that the Government failed to prove that the evidence of her personal use of crack cocaine was probative of a material issue other than her character and propensity to commit the charged crime, and therefore, the district court erred in admitting this evidence.

The Government argues that the district court did not err in admitting this evidence. The Government asserts that, because possession with the intent to distribute a controlled

substance is a specific intent crime, it was permitted to offer other acts evidence under Rule 404(b) in order to establish Jenkins' intent to commit the charged offense. Here, the Government claims that the district court correctly admitted the prior bad acts evidence because it was probative of Jenkins' knowledge of the contents of the express mail packages and that the district court mitigated any unfair prejudicial effect which the evidence might have had against her by giving a limiting instruction to the jury informing it of the extent to which it should, if at all, consider this evidence.

"This court reviews a district court's evidentiary determinations under Fed. R. Evid. 404(b) for abuse of discretion. A district court is considered to have abused its discretion when this court is left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Copeland*, 321 F.3d 582, 595 (6th Cir. 2003)(internal citations and quotations omitted).

Federal Rule of Evidence 404(b) provides, in relevant part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." *Id*. This Court has established a three-step process for determining the admissibility of other acts evidence under Rule 404(b). *First*, the district court must decide whether there is sufficient evidence that the other act in question actually occurred. *Second,* if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. *Third*, if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect. *United States v. Haywood*, 280 F.3d 715, 719-20 (6th Cir. 2002).

In the present case, there is no doubt that the bad act occurred; Jenkins freely admitted that she used crack cocaine. Thus, the first step in the Rule 404(b) analysis is satisfied.

However, the Court finds that the second and third steps of the analysis are not satisfied in this case, and therefore, the district court abused its discretion in allowing the Government to introduce evidence at trial of Jenkins' prior crack cocaine usage.

"Evidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *Id*. at 720 (citing *United States v. Johnson*, 27 F.3d 1186, 1190-91 (6th Cir. 1994). Here, the Government asserts that it introduced evidence of Jenkins' past crack cocaine usage in order to establish her knowledge that the express mail packages which she was receiving on Ingram's behalf contained crack cocaine. Because Rule 404(b) explicitly includes "knowledge" as a proper purpose for which other acts evidence may be admitted, we find that the evidence was offered for an admissible purpose.

Furthermore, we find that Jenkins' knowledge as to the contents of the express mail package was "in issue" during the trial. "[P]rior bad acts are not admissible to prove defendant's knowledge unless defendant places his mental state at issue or his knowledge of the [narcotics are] not inferable from proof of possession itself." *United States v. Jobson*, 102 F.3d 214, 221 (6th Cir. 1996); *see United States v. Lash*, 937 F.2d 1077, 1087 (6th Cir. 1991)(holding that "[t]he district court had broad discretion to admit evidence of crimes other than those charged or wrongful acts, pursuant to Fed. R. Evid. 404(b), if those other crimes or acts are relevant to intent or knowledge which are elements of the crime charged.").

The Indictment returned against Jenkins charged her with knowingly possessing, with the intent to distribute, fifty grams or more of cocaine base in violation of 21 U.S.C. § 841(a). Her defense at trial was that she did not know–and the Government had failed to prove otherwise–that the express mail package contained crack cocaine. Thus, Jenkins' knowledge was "in issue" during her trial.

However, we do not believe that the Government's evidence regarding Jenkins' prior crack cocaine usage is probative of her knowledge as to the contents of the express mail package, which would, in turn, establish her intentional participation in the distribution of crack cocaine. This Court has held that "'acts related to the personal use of a controlled substance are of a wholly different order than acts involving the distribution of a controlled substance. One activity involves the personal abuse of narcotics, the other the implementation of a commercial activity for profit.'" *Haywood*, 280 F.3d at 721 (quoting *United States v. Ono*, 918 F.2d 1462, 1465 (9th Cir. 1990). Thus, Jenkins' admission that she is a crack cocaine user does not *ipso facto* lead to the conclusion that she was involved in the distribution of crack cocaine.

Although the Government cites several cases in its brief in support of its position that the district court correctly admitted the other acts evidence, those cases are distinguishable in that the pertinent other acts involved in those cases dealt with drug distribution, not personal use as is the case here. *See, e.g.,* *United States v. Myers*, 123 F.3d 350, 363 (6th Cir. 1997)(admitting the testimony of four different witnesses concerning prior drug transactions with the defendant in order to show his intent to distribute); *United States v. Clemis*, 11 F.3d 597, 601 (6th Cir. 1993)(admitting evidence of a prior drug transaction identical to the transaction for which the defendant was indicted in order to show his knowledge and involvement in the drug conspiracy); *Johnson*, 27 F.3d at 1191 (admitting evidence of the defendant's past drug sales in order to show his intent to distribute cocaine); *United*

*States v. Feinman*, 930 F.2d 495, 499 (6th Cir. 1991)(admitting testimony that the defendant was involved in prior transportation of marijuana with the same participants and the same mode of operation as charged in the indictment).

Likewise, the Court disagrees with the Government's theory that Jenkins' responses to the questions posited by Kramer are probative of her knowledge of the contents of the express mail package(s). At trial, Kramer offered the following testimony regarding a conversation which he and Gibson had with Jenkins regarding her crack cocaine usage:

Q. And what did she tell you?

A. She did admit to us that she did smoke crack cocaine, was a current user of crack cocaine.

Q. And did she say anything about whether or not this Brian was a source of her crack cocaine?

A. We asked her that, and she said no. She got it from some guy down the street and didn't want to reveal who that was.

Thus, contrary to the Government's assertion, Jenkins' response to Kramer's questioning did not establish her knowledge of the contents of the express mail package. Jenkins did not acknowledge that she knew that Ingram was a drug dealer; in fact, her response does not even suggest nor could one reasonably infer that she knew him to be involved in the distribution of crack cocaine. Accordingly, we find that the district court abused its discretion in admitting into evidence at trial Jenkins' admission that she used crack cocaine because the evidence was not probative of a material issue at trial other than her character and propensity to commit the charged offense.

We also find that the district court abused its discretion in admitting into evidence at trial Jenkins' admission that she

used crack cocaine in the past because the probative value of this evidence is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403; *see Haywood*, 280 F.3d at 723 (holding that "[p]robative 'other acts' evidence is nevertheless inadmissible if the value of the evidence is substantially outweighed by its potential prejudicial effect."). We reach this conclusion for three reasons.

*First*, as was the case in *Haywood*, the admission by the district court of the fact that Jenkins had previously possessed crack cocaine for personal use

> "unquestionably [had] a powerful and prejudicial impact." *Johnson*, 27 F.3d at 1193. By "branding" [Jenkins] as a criminal possessing crack cocaine, this evidence had "the natural tendency to elicit the jury's opprobrium for [Jenkins]." *United States v. Spikes*, 158 F.3d 913, 929 (6th Cir. 1998). The evidence further invited the jury to conclude that [Jenkins] "is a bad person . . . and that if [s]he 'did it [once] [s]he probably did it again.'" *Johnson*, 27 F.3d at 1193.

*Haywood*, 280 F.3d at 723.

*Second*, as will be discussed *infra*, the evidence proffered against Jenkins by the Government was weak, especially the evidence presented regarding her alleged knowledge that the express mail packages sent to her contained crack cocaine. In fact, the only real evidence offered by the Government in order to establish her knowledge came from the contested Rule 404(b) evidence.

*Third*, given the substantial prejudice caused by the admission of this other acts evidence, we do not believe that the district court's limiting instruction was a sufficient remedy. "A limiting instruction will minimize to some degree the prejudicial nature of evidence of other criminal acts; it is not, however, a sure-fire panacea for the prejudice

resulting from the needless admission of such evidence." *Id.* at 724.

For these reasons, we conclude that the district court abused its discretion in admitting into evidence the fact that Jenkins' had previously smoked crack cocaine.[3]

C.  *SUFFICIENCY OF THE EVIDENCE*

Finally, Jenkins argues that the Government failed to present sufficient evidence with which a reasonable jury could have found her to be guilty of the charged offense. Specifically, Jenkins asserts that the Government failed to present substantial evidence that she was aware that the express mail package which was sent to her home contained crack cocaine. As stated *supra*, Jenkins contends that her statement to Kramer (*i.e.,* that she obtained her crack cocaine from someone other than Ingram) was not probative on the issue of whether she was aware that he was a crack cocaine dealer and, thus, that the packages which she was receiving on his behalf contained crack cocaine. Jenkins claims that the fact that she received money in exchange for receiving an unopened box at her residence is an insufficient basis upon which to find her guilty of possession with the intent to distribute crack cocaine. At most, Jenkins argues that the Government showed that she may have thought that the express mail packages contained something illegal, but it did not prove that she knew that the packages contained cocaine base.

The Government argues that it presented sufficient evidence at trial in order to support Jenkins' conviction. The Government asserts that, during the trial, it offered evidence that Jenkins received express mail packages at her home for which she signed, and in return, Ingram paid her $50.00 per

---

[3]We will discuss, *infra*, whether the district court's improper evidentiary ruling requires us to reverse Jenkins' conviction.

package. In addition, Jenkins lied to law enforcement officers regarding the intended recipient of the package and, then, recanted. When asked by Gibson about the package, Jenkins responded, "What do you think it is?" Gibson responded, "I know what it is. It is a delivery of drugs, illegal drugs. And I am very surprised that you are the one that it is being delivered to." Jenkins replied, "Yeah."

Furthermore, the Government offered: (1) Jenkins written statement which she made at the Obion County Jail after her arrest, (2) her admission that she was a crack cocaine user, and (3) her statement that she obtained her crack cocaine from someone other than Ingram. Viewing the evidence in a light most favorable to it, the Government contends that a reasonable jury could find Jenkins to be guilty, beyond a reasonable doubt, of the charged offense.

This Court has held:

> In determining whether the evidence supporting [the defendant's] conviction is sufficient, we must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002)(quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979)). We "view both circumstantial and direct evidence in a light most favorable to the prosecution," *id.*, and "we draw all available inferences and resolve all issues of credibility in favor of the [factfinder's] verdict," *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir.), *cert. denied*, 534 U.S. 916, 122 S. Ct. 263, 151 L. Ed.2d 192 (2001), and *cert. denied*, 534 U.S. 936, 122 S. Ct. 306, 151 L. Ed.2d 228 (2001).

*United States v. Wade*, 318 F. 3d 698, 701 (6th Cir. 2003). "'A defendant claiming insufficiency of the evidence bears a very heavy burden. . . . Circumstantial evidence alone is

sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.'" *United States v. Stines*, 313 F.3d 912, 919 (6th Cir. 2002)(quoting *United States v. Warwick*, 167 F.3d 965, 971 (6th Cir. 1999).

In the case *sub judice*, we find that, even when taking all of the evidence in a light most favorable to the Government, the Government did not present sufficient evidence at trial with which a reasonable jury could have found Jenkins to be guilty beyond a reasonable doubt of the charged offense. As noted *supra*, the Indictment returned against Jenkins charged her with knowingly and intentionally possessing, with the intent to distribute, at least fifty grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1), and therefore, the district court properly charged the jury that it must find, beyond a reasonable doubt, that Jenkins knew that the contents of the express mail package was cocaine base. *See United States v. Harris*, 293 F.3d 970, 974 (6th Cir 2002)(listing the essential elements which must be established in order to sustain a conviction under 21 U.S.C. § 841(a)(1)).

Despite the jury's finding to the contrary, we do not believe that the Government presented sufficient evidence on this element. In order to establish this element, the Government relied principally upon the testimony of Kramer, who testified that Jenkins had admitted that she was a crack user and that she obtained her crack from someone other than Ingram, and upon the testimony of Gibson, who testified about his conversation with Jenkins regarding her receipt of the express mail packages.

We have already concluded that the district court abused its discretion in allowing Kramer to offer testimony regarding Jenkins' prior crack cocaine usage, and

> we will presume that the district court's error was reversible unless we can say, "with fair assurance, after pondering all that happened without stripping the

erroneous action from the whole, that the judgment was not substantially swayed by the error. . . ." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946). Whether the jury was "substantially swayed" by the improper admission of evidence of other acts in a criminal trial generally depends on whether the properly admissible evidence of the defendant's guilt was overwhelming.

*Haywood*, 280 F.3d at 724. Here, there was a clear absence of evidence (let alone overwhelming evidence) establishing Jenkins' knowledge as to the contents of the express mail packages. As such, the Court finds that, not only did the district court abuse its discretion, it committed reversible error in admitting evidence of Jenkins' prior crack cocaine usage.

The Government also points to Gibson's testimony in order to establish Jenkins' alleged knowledge that the express mail packages contained crack cocaine. At trial, Gibson testified that he had the following colloquy with Jenkins at her home on the day of her arrest:

Q. All right. And what happened when you and Investigator – or Inspector Kramer went to the rear bedroom with Ms. Jenkins?

A. Well, of course, she had been advised of her constitutional rights not to make any statement once the search warrant was presented and served. And then she signed the consent to search. And once myself and Inspector Kramer were in the back, I just plainly asked her. I said, "Candy, what are you doing here? What is this?"

And she said something like, "What do you think it is?"

And I said, "I know what it is. It's delivery of drugs, illegal drugs. And I'm very surprised you're the one it's being delivered to."

And she said, "Yeah."

* * *

And I asked her if she knew what was in the packaging. She said, "I didn't."

We believe that Jenkins' responses to Gibson's questions were, at best, ambiguous; merely responding to a question with a question and then later using the word, "Yeah" in response to an assertion of fact does not constitute a sufficient basis upon which the jury could glean Jenkins' knowledge, especially in light of the fact that Jenkins denied having knowledge of the content of the express mail package immediately after saying, "Yeah."

Nevertheless, the Government's argument does have some support factually and from case law. It is true that Jenkins received $50.00 per package from Ingram just for allowing the express mail packages to be delivered to her home and that Jenkins falsely told the law enforcement officers that the express mail package at issue was for "Sarah Johnson." Moreover, in *United States v. Calhoun*, 49 F.3d 231 (6th Cir. 1995), this Court affirmed a conviction despite the defendant's denials as to her knowledge of the contents of a package where she signed a false name when receiving a package containing a kilogram of cocaine which she admitted was for her live-in boyfriend, where she admitted that she knew that her boyfriend sold drugs, and where she admitted that her boyfriend's drug money paid for the furniture in their apartment. *Id*. at 233-34.

But, *Calhoun* is factually distinguishable from this case. The defendant in *Calhoun* admitted that she knew that the recipient of the package was dealing drugs while Jenkins

denied knowing that Ingram was a drug dealer. Moreover, the Government did not present any evidence with which to conclude that Jenkins had an intimate relationship with Ingram from which the jury could reasonably infer that she knew that Ingram dealt drugs; on the other hand, the defendant in *Calhoun* knew that the recipient of the package (*i.e.*, her live-in boyfriend) was a drug dealer. Finally, the police did not find any other objects in Jenkins' apartment associated with criminal conduct, and she signed her own name when receiving the express mail package. In contrast, the defendant's apartment in *Calhoun* was furnished by the proceeds of her boyfriend's drug trafficking, and she signed a false name when receiving the package containing a kilogram of cocaine.

Furthermore, although it is true that one's suspicions might be raised at the prospect of receiving $50.00 merely in exchange for receiving a package at one's home, mere suspicion cannot sustain a verdict of guilt beyond a reasonable doubt. *See United States v. Pena*, 983 F.2d 71, 72-73 (6th Cir. 1993)(holding that even though a passenger in a car carrying seventeen kilograms of cocaine suspected that something illegal was going on, that suspicion did not prove that she actually knew or intended to aid the driver in the distribution of cocaine); *see also United States v. Craig*, 522 F.2d 29, 31-32 (6th Cir. 1975)(holding that "[i]t would be highly conjectural and speculative indeed to conclude from these facts [where the defendant drove a friend who was carrying a closed box to an apartment for a drug sale, waited for him, fled from the scene when law enforcement agents arrived, abandoned his truck and shotgun, and eluded police officers for two years] that Craig had knowledge of the presence of drugs in the closed box . . . ."); *see also United States v. Hayter Oil Co., Inc. of Greenville, Tennessee*, 51 F.3d 1265, 1271 n. 5 (6th Cir. 1995)(quoting *United States v. Van Hee*, 531 F.2d 352, 357 (6th Cir. 1976)(holding that "'[e]vidence that at most establishes no more than a choice of reasonable probabilities cannot be said to be sufficiently substantial to sustain a criminal conviction upon appeal.'").

In sum, the express mail package recovered from Jenkins on the day of her arrest was unopened. She consistently denied having knowledge of the contents of the express mail package, and even the law enforcement officials who inspected the express mail package initially thought that it contained marijuana, not crack cocaine. Kramer's testimony regarding Jenkins' prior bad acts was inadmissible. And, Gibson's testimony, standing alone, regarding his conversation with Jenkins as to the contents of the express mail package is an insufficient basis upon which to ground a conclusion that Jenkins knew that the express mail package sent to her home contained crack cocaine and, therefore, that she intentionally became involved in its distribution. In order to sustain a conviction, the Government had to present evidence that Jenkins knew that the express mail package contained cocaine base (as opposed to some other illegal substance or contraband), and the Government failed to present sufficient evidence with which to establish Jenkins' knowledge and her intent to distribute crack cocaine.

Accordingly, the Court finds that the Government failed to present sufficient evidence with which a reasonable jury could find Jenkins to be guilty beyond a reasonable doubt of the charged offense. As such, Jenkins' conviction is reversed.

D.    *SENTENCE*

Because we reverse Jenkins' conviction, we need not address her argument that the district court erred in denying her a two-level reduction, pursuant to U.S.S.G. § 3B1.2, in her base offense level for being a minimal or minor participant or her argument that the district court erred in failing to sentence her pursuant to U.S.S.G. § 5C1.2 and U.S.C. § 3553(f)'s safety-valve provisions.

**III. CONCLUSION**

For all of the reasons set forth above, we **REVERSE** Jenkins' conviction and **REMAND** with instructions to dismiss the Indictment.