**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Max GALINDO Defendant–Appellant.**

No. 02–1830.

United States Court of Appeals,
Sixth Circuit.

April 16, 2004.

Joseph J. Allen, Kathleen Moro Nesi, Asst. U.S. Attorney, U.S. Attorney's Office, Detroit, MI, for Plaintiff–Appellee.

Karen J. Davis Roberts, Saline, MI, for Defendant–Appellant.

Before NORRIS, COLE, Circuit Judges; and ECONOMUS, District Judge.[*]

## OPINION

COLE, Circuit Judge.

Defendant–Appellant Max Galindo appeals his conviction for conspiracy to possess with intent to distribute over 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1). On appeal, Galindo, who was sentenced to 120 months' imprisonment and eight years of supervised release, argues that the district court erred by admitting evidence of prior bad acts as character evidence which was prohibited by Federal Rule of Evidence 404(b). For the reasons stated below, we AFFIRM Galindo's conviction.

## I. BACKGROUND

Galindo was convicted of conspiracy to possess with intent to distribute marijuana after a jury trial. The conspiracy involved a shipment of marijuana from Texas via Roadway Express, a commercial freight company. Texas Border Patrol agents intercepted this shipment bound for Detroit, Michigan. They also identified and intercepted four additional packages from the same source—also containing marijuana—that were being shipped to Cicero, Illinois, near Chicago. Law enforcement agents arranged for controlled deliveries of these packages.

Co-conspirator Gavin Gardner arranged with Roadway Express to pick up the Detroit-bound package in Toledo rather than in Detroit. Gardner and co-conspirators Hector Vellejo, Arturo Vallejo, and Ernesto Rodriguez—all of whom had been involved in the pick-up of the four Cicero-bound packages at the Chicago Roadway Express location—drove to Toledo in a green Chrysler automobile. Galindo and Ernesto Denis–Zuira, driving a pick-up truck, met the four co-conspirators at a gas station in Ohio. Gardner then drove the pick-up truck to the Toledo Roadway Express office and picked up the package. The pick-up truck (driven by Gardner), the Chrysler (containing a driver and two passengers), and a 1991 beige Mercury Marquis registered to Galindo (with three occupants) met in a Sears Department Store parking lot in Lincoln Park, Michigan.

At that point, Gardner, Deni–Zuira, and Hector Vallejo delivered the package to a house on Second Street in Ecorse, Michigan—the residence of Lauro Ordonez, who likewise was charged as a co-conspirator. They then returned to Sears, where Galindo and the other three individuals had remained. Galindo then drove Arturo Vallejo and Rodriguez to Galindo's friend and co-worker Justin Adkins's house in the Chrysler. Galindo asked Justin Adkins if his companions could drink some beer and smoke marijuana with Justin and his twin brother Jason. After visiting for between twenty minutes and an hour, Galindo and his two companions left the Adkins brothers' house, at which time they were arrested. The other conspirators had been arrested in the Sears parking lot. Various items of evidence not directly relevant to this appeal were seized on the persons of the co-conspirators and in the vehicles.

[*] The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

Galindo's defense at trial was innocent presence. He argued that he had no idea that the truck he transported to Toledo was going to be used to transport 740 pounds of marijuana to the Detroit area.

## II. DISCUSSION

 Galindo complains that the district court allowed the Government to use impermissible character evidence when it allowed Justin and Jason Adkins to testify regarding prior bad acts. *See* Fed.R.Evid. 404(b). Galindo does not specify which portions of the testimony were objectionable. At issue, it appears, is the testimony that Galindo had sold or given both Justin and Jason small quantities of marijuana on numerous occasions. The remainder of the testimony given by the two brothers either was not related to prior bad acts or was directly related to the charged conduct (i.e., testimony that Galindo and his companion had been traveling to Texas and Ohio and testimony regarding a proposed sale of marijuana by Galindo to Jason Adkins from the shipment). We review the district court's decision to admit the testimony for abuse of discretion. *See United States v. Jenkins,* 345 F.3d 928, 936 (6th Cir.2003).

The Government argues that the evidence of previous transactions is not 404(b) character evidence but "background" evidence. We have recognized the admissibility of "background" or *"res gestae"* evidence, but have said that "the 'background circumstances exception' to the general exclusion of other act evidence is not an open ended basis to admit any and all other act evidence the proponent wishes to introduce." *United States v. Hardy,* 228 F.3d 745, 748 (6th Cir.2000). "[B]ackground or *res gestae* evidence consists of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the

story of the charged offense." *Id.* "Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id.* It is not enough for the Government to use the words of our previous opinions—"prelude to the charged offense," "did not arise in a vacuum," "didn't spring out of dry water," "completes the story of the crime"—the Government must be able to articulate why they apply to the case at hand.

The Government's more general argument—that the small-time marijuana dealing in which Galindo engaged is itself intrinsic to the charged shipment and delivery of the large crate of marijuana—is easily rejected. The fact that Galindo was a small-time drug dealer to the Adkins brothers is simply not background context for the shipment and delivery of the marijuana in the charged offense: it does not show anything about the history and development of the conspiracy to smuggle the shipment, nor does it demonstrate how the conspiracy arose (i.e., that it did not arise "out of a vacuum"). The Government has offered no argument why we should consider this small-time drug dealing part of the "same series of transactions" as the shipment of a large quantity of marijuana across state lines. The Government refers to the drug dealing as "a prelude to the charged offense" but does not explain why that is so. If it is "a prelude" because small time dealers are, on average, more likely to get involved in larger drug smuggling, then that is exactly the type of propensity argument that F.R.E. 404 forbids. ("A pre-

lude" is, for example, a robbery of a gun for use in the charged crime).

Thus, if the Government succeeds, it must succeed on the two more specific arguments that it makes. First, it argues that the testimony provides a "background" to the charged conduct because it demonstrates a previous connection between Galindo and the house to which the charged shipment of marijuana was delivered. Second, it argues that it explains why Galindo would feel comfortable going to the Adkins brothers' residence and discussing the marijuana shipment with them.

The Government's argument that the testimony demonstrates a previous connection between Galindo and the house to which the charged shipment of marijuana was delivered—although not made to the district court—is meritorious, at least as to Jason Adkins's testimony. Jason tied Galindo to the house on Second Street in Ecorse. He testified that when he wanted to buy marijuana from Galindo, Galindo would sometimes go to the house on Second Street. (J.A. 421). Jason also testified that "Lauro" lived at the house. (J.A. 420–21). The house on Second Street was the location to which the co-conspirators ultimately delivered the crate of marijuana that was being carried on the truck that Galindo transported to Ohio. Thus, Jason Adkins's testimony is arguably "background" to the conspiracy in that it is evidence of a previous drug connection between Galindo and co-conspirator Lauro Ordonez and the house on Second Street. Justin Adkins's testimony includes no such connection, and his testimony recounted more drug transactions and in more detail than Jason's. (The connection between Galindo and the Second Street house also forms the basis of the Government's "absence of mistake" argument. Since we conclude that this testimony was likely admissible as background evidence, and in

any case, harmless error, we do not address the absence of mistake argument).

The Government's second argument is that the evidence of the prior small-scale marijuana dealing is "background" because it explains why Galindo was "comfortable" going to the Adkins brothers with his two co-conspirators is not meritorious. The Government fails to assert why whether Galindo was "comfortable" going to the Adkins brothers is background to the charged conduct. At best, it would be relevant because it slightly increases the probability the Adkins brothers were telling the truth when they testified that Galindo made various statements to them about the shipment because it does give a reason why Galindo would be even more comfortable talking to them about it (in addition to the fact the Justin was his friend and co-worker). However, this is not "background" to the charged offense, but merely background explanation of a relationship between Galindo and the witnesses that makes it more likely that Galindo would actually make the statements that the witnesses claim he made about the charged conduct. Thus it does not fall within the category of "background" or *"res gestae"* evidence described in *Hardy.*

Regardless, however, the admission of Justin Adkins testimony was harmless error. First, there was significant admissible testimony by the Adkins brothers—not relating to the prior drug dealing—that suggests that Galindo was aware of the contents of the package he helped pick up and deliver. Further, this admissible testimony included testimony that Galindo was prepared to sell drugs from this shipment to the Adkins brothers. Thus the fact that Galindo would sell drugs to the Adkins brothers was already properly before the jury

Second, the jury would have known from Jason Adkins's testimony—tying Galindo

to the Second Street house—that Jason had bought marijuana from Galindo on other occasions, as well. Given that the jury already had this information before it, a few further instances of small-scale drug sales between Galindo and his friend and co-worker Justin Adkins, although not helpful to Galindo, adds little in the way of additional prejudice. Further, the district court limited the prejudice by instructing the jury that Galindo was on trial only for the crimes charged in the indictment. To the extent that any of the testimony about specific instances of prior drug transactions was improperly admitted, such admission was harmless error.

## III. CONCLUSION

For the reasons above, we AFFIRM Galindo's conviction.